## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| VASANT THAKKAR and PRAFULLA THAKKAR, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 08 C 3344 |
| STATION OPERATORS INC., d/b/a EXXONMOBILE CORS, EXXONMOBILE OIL CORP., and KELLY BISSIAS, | ) ) ) ) ) | Judge Rebecca R. Pallmeyer |
| Defendants. | ) | |

### MEMORANDUM OPINION AND ORDER

Until February 2007, Plaintiffs Vasant and Prafulla Thakkar, husband and wife, were employed by Defendant Station Operators, Inc. ("SOI"), a subsidiary of Defendant ExxonMobil Oil Corp. ("Exxon") that staffs and operates Exxon's gas stations. The Thakkars are of Indian descent, are Hindu, identify their race as East Asian, and were born in 1951. Plaintiffs were terminated from their jobs after an incident in which they admitted to transferring five cases of windshield wiper fluid between the two stations where they worked, in violation of SOI's internal policies. Defendant Kelly Bissias was Vasant's direct supervisor at the time of his termination. Plaintiffs claim Bissias authorized the transfer and then lied about it to her superiors, resulting in both Plaintiffs being discharged. In an amended complaint filed in October 2008, Plaintiffs allege that Defendants discriminated against them on the basis of age, race, national origin, and religion in violation of Title VII of the Civil Rights Act of 1964 (29 U.S.C. § 623 *et seq.*), 42 U.S.C. § 1981 ("Section 1981"), and the Age Discrimination in Employment Act, 42 U.S.C. § 2000e *et seq.* ("ADEA"). Plaintiffs also advance state law claims of common-law retaliatory discharge against Defendants and tortious interference against Bissias.

Defendants have filed a motion for summary judgment on all claims. For the reasons set forth below, Defendants' motion is granted in part and denied in part. The court also addresses

Plaintiffs' motion to supplement the record based on newly discovered evidence; that motion is granted in part and denied in part.

## BACKGROUND

Vasant Thakkar began his employment with SOI as a sales associate in November 2000, and was promoted to assistant store manager in August 2001. (Pl.'s 56.1 Resp. ¶ ¶ 19, 21.) Prafulla Thakkar, Vasant's wife, joined SOI in May 2002, and she too was promoted to assistant store manager in April 2004. (*Id.* at ¶ ¶19, 21.) During the relevant period, Vasant worked at the Exxon station in Aurora, Illinois, and Prafulla worked at the station in the neighboring town of Naperville, Illinois. (*Id.* at 22.)[1] Though Vasant worked under a number of managers during his tenure at SOI, Defendant Kelly Bissias–who is Caucasian, 31 years old, and of Irish descent–was his store manager and direct supervisor during the period between September 2005 and February 2007. (*Id.* at ¶ 24.) At all relevant times, William Szenda was Prafulla's store manager and direct supervisor. (*Id.* at ¶ 23.) Plaintiffs' claims arise chiefly out of the series of events that culminated in their terminations. Unless otherwise indicated, the facts set forth here are undisputed. Where the parties disagree, the court views the facts and draws all reasonable inferences that flow from them in the light most favorable to Plaintiffs, as the nonmoving party. *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003).

## I.     Plaintiffs' Discharge

### A.     Vasant's Complaints Against Bissias

In October 2006, Vasant filed a complaint with SOI Territory Manager Brad Marcinkiewicz against Bissias, alleging that Bissias was violating company security procedures at the Aurora station. (*Id.* at ¶ 25.; V. Thakkar Dep. Ex. No 3.) Marcinkiewicz was responsible for overseeing the area that included the Aurora and Naperville stations and, in that capacity, he was Bissias's

---

[1]     For the sake of clarity and to easily distinguish between Plaintiffs, the court refers to Mr. and Mrs. Thakkar by their first names upon second reference.

superior in the SOI hierarchy. Marcinkiewicz met Vasant at a Burger King restaurant near the Aurora station to discuss the complaint, and Vasant subsequently memorialized their discussion in a letter to Marcinkiewicz, a copy of which is in the record. (V Thakkar Dep at 67-68; V. Thakkar Dep. Ex. No 3.) At that meeting, Vasant reported that Bissias had repeatedly left the key to the Aurora store's safe in insecure places and had counted money from the cash register in the open, contrary to company policy. (*Id.*) He also accused Bissias of sharing her computer log-in password with other store employees, allowing employees to sign her name to company reports, and purchasing lottery tickets while wearing her store uniform–all in violation of company policy. (*Id.*; Pl.'s 56.1 Resp. ¶ 25.) "All the breaches of policy as well as security," Vasant wrote, "threaten the safety as well as proper running of the store . . ." (V. Thakkar Dep. Ex. No 3.)

At their October 2006 meeting, Vasant showed Marcinkiewicz security-camera photographs that corroborated his accusations. Marcinkiewicz thanked Vasant for reporting his concerns and undertook an investigation that confirmed that Bissias had, in fact, left the safe keys unsecured, allowed other employees to use her computer password, and purchased lottery tickets while wearing her uniform. (V Thakkar Dep. at 68; Pl.'s 56.1 Resp. ¶ 26.) In a letter dated November 6, 2006, Marcinkiewicz wrote to Vasant:

> I have taken into account the security concerns that you had stated to me on October 28, 2006. Upon completion of a full investigation, I believe that any and all concerns have been addressed and the proper corrective actions have been taken . . . . I am confident that the steps taken . . . will eliminate any concerns or violations . . . . I wanted to personally thank you for bringing your concerns to me, and strongly encourage you to do so in the future should you ever have further questions or concerns in your work environment . . .

(V. Thakkar Dep. Ex 4.) Despite his professed gratitude, however, Marcinkiewicz still placed a "counseling letter" into Vasant's employment file. Unauthorized removal of company documents from a store site is against SOI's company policies, and Marcinkiewicz reprimanded Visant for removing the security-camera photographs from the store site for the purpose of the meeting. (Marcinkiewicz Dep. at 157.) Vasant had never received a reprimand of any kind before.

Marcinkiewicz also "counseled" Bissias about the security issues Vasant raised and placed a letter of reprimand in her employment file. (Pl.'s 56.1 Resp. ¶ 27; Bissias Dep. at 60-62.)[2] When Bissias learned of Vasant's complaint some time between November 2006 and January 2007, she was upset. "He never came to me with any of this so I felt it [was] disrespectful," Bissias testified. (Bissias Dep. at 65.)

There is no evidence that Vasant was aware that Bissias had been reprimanded as a result of his initial complaint. On January 17, 2007, he lodged a second complaint against her, this time in a letter directed to Marcinkiewicz's superior, SOI Operations Manager Kim Kemper. (Pl's 56.1 Resp. at ¶ 28.) Vasant explained that he felt compelled to send the complaint directly to Kemper because he believed Bissias and Marcinkiewicz to be "good friends." (V. Thakkar Dep. Ex 6.) Defendants deny that Bissias and Marcinkiewicz "have any sort of current social relationship," but they concede that on at least five occasions Bissias and Marcinkiewicz did participate in social outings outside of work. (Def. 56.1 Resp. at ¶ 5.)[3] As a result of this perceived relationship and the earlier reprimand that he had received, Vasant suggested to Kemper that he doubted that Marcinkiewicz would handle the second complaint fairly. (V. Thakkar Dep. Ex 6.) Vasant wrote Kemper that, in the time since his earlier complaint, "[n]ot only have many of the security breaches continued, but alarmingly, there is substantial evidence demonstrating Ms. Bissias' hostility towards me as a result of my alerting higher authorities . . ." (*Id.*) Vasant's letter detailed the following

---

[2] The letter of reprimand is not in the record, and the court is unable to discern when the letter was actually placed in Bissias's file. While Bissias reported that she learned about the initial complaint some time between November 2006 and January 2007, she could not remember exactly when she was reprimanded. (Bissias Dep. at 65.)

[3] Vasant was not asked why the perceived relationship between Marcinkiewicz and Bissias did not dissuade Vasant from filing his initial complaint, but, as noted, it is not clear that Vasant was aware that Bissias had been reprimanded as a result of that earlier complaint. Bissias admitted that she and Marcinkiewicz were indeed friends, and would occasionally go to lunch together or get drinks at a local bar and grill after work. (*Id.* at 15-19.) On one occasion Bissias obtained VIP tickets for Marcinkiewicz and his friends to attend Naperville's "RibFest" festival. (*Id.* at 19-23.) It is unclear whether or how Vasant would have been aware of any of these interactions.

behavior: Bissias began referring to Vasant as "you" at employee meetings; she frequently gave other employees permission to leave work early during Vasant's shift without advising him; she directed Vasant to empty money from the car wash after dark and to make nighttime bank deposits on New Year's Eve; she reduced Vasant's average weekly hours from 38 hours to 36 hours per week; on one occasion, she required Vasant to work 10 consecutive days including Christmas and overnight on New Year's Eve;[4] and she falsely accused Vasant of misplacing company records. (*Id.*; Pl's 56.1 Resp. at ¶ 29.) Though Vasant did not indicate at that time that he believed these actions were the result of discriminatory animus–in fact, he speculated that Bissias was retaliating "as a result of [Vasant's] alerting higher authorities"–he did state that he believed Bissias's behavior violated provisions of the company's Workplace Harassment and Equal Employment Opportunity policies. (Pl's 56.1 Resp. at ¶ 29.)[5] Plaintiffs now contend that requiring Vasant to work more than seven consecutive days was an act of unlawful discrimination.

Kemper opened a formal inquiry into Vasant's complaint on January 25, 2007, and assigned the investigation to Mary Ann Kause, a paralegal in Exxon's legal department. (Def.'s 56.1 Resp. at ¶13, Pl's 56.1 Resp. at ¶ 31.) After conducting her investigation, Kause concluded that Vasant's claims could not be credited and closed the investigation on February 20, 2007. (*Id.* at ¶ 32.)[6] Roughly one month later, on March 26, 2007, SOI Human Resources Advisor Erik VanDuivendyk

---

[4] The parties agree that requiring Vasant to work involuntarily in excess of seven consecutive days would have violated Illinois's One Day Rest in Seven Act, 820 ILCS 140/6, and Exxon's internal ethics policy. (Def.'s 56.1 Resp. ¶ 11.)

[5] SOI and Exxon maintain official harassment and equal employment opportunity policies, copies of which are in the record. (Solis-Mendoza Dec. Ex Nos. 3, 4.) Not surprisingly, the parties disagree as to whether these policies were properly implemented with regard to Plaintiffs.

[6] Though Kause did not testify as to the content of her investigation, the record and report generated by the investigation are in the record. (Bailey Dec., Ex. 8 to Def.'s 56.1 Stat.) Those records show that Kause interviewed several employees, including Vasant and Bissias, at the Aurora store location and reviewed store documents. The reports do not contain notes of conversations or otherwise reveal the content of Kause's interviews.

sent Vasant a letter stating, "we have completed the investigation into the claim you submitted to [SOI] Human Resources. Based on the findings of the investigation, the proper response has been taken and the case is now closed." (VanDuivendyk Dep. at 67-68.) By the time this letter was issued, the Thakkars had been terminated from SOI. No disciplinary action was ever taken against Bissias or Marcinkiewicz in connection with the complaint.

### B. SOI/Exxon's Driving and Transfer Rules

SOI maintains a list of "posted offenses," the commission of which "may result in [an employee's] suspension or discharge without prior notice." (V. Thakkar Dep., Ex. 7; P. Thakkar Dep. Ex. 14.) These posted offenses include: "[r]efusing or neglecting to obey a Company order," and "[v]iolating a safety rule (See Safety and Health section of the [SOI] Employee Handbook)." (*Id.*) Prafulla and Vasant signed documents when they began employment with SOI and periodically as policies were updated, ackowledging that they had read and understood the list of posted offenses and the employee handbook. (*Id.*) In addition to those materials, SOI also maintains a set of standard operating procedures ("SOPs") that articulate company rules regarding driving and transfers of inventory. (Marcinkiewicz Dec. at ¶ 6-8.)[7] Ostensibly in an effort to increase worker safety, reduce the company's potential legal liability for accidents, and prevent the loss of store inventory, the SOPs prohibit employees from driving on company business or transferring inventory between store locations without proper authorization. (*Id.* at ¶ ¶ 7, 8, 10, 11.) Under the SOPs, assistant store managers may neither perform business-related driving nor transfer inventory between stores without preapproval from their territory manager. (*Id.* at ¶ 7-8.)

The driving guidelines, which had been in effect since at least 2004, were reviewed at a

---

[7] Marcinkiewicz was deposed both with regard to his personal knowledge in this case and as a Rule 30(b)(6) witness of behalf of SOI/Exxon. In their Rule 56.1 Response, Plaintiffs object to Marcinkiewicz's reference to and introduction of the SOPs on grounds of relevance and foundation. Plaintiffs' objection is overruled. The SOPs are clearly probative of whether Defendants had a legitimate reason for discharging Plaintiffs, and the SOP documents will be admissible at trial.

company meeting of store and territory managers in Chicago in August 2006.  (*Id.* at ¶10; Szenda Dep. 21-22; Kemper Dep. at 37.)  It is undisputed that, prior to August 2006, the driving rules had been loosely enforced, and it had been a common practice for SOI employees to transfer inventory between stores without authorization and for managers and assistant managers to drive their own vehicles to conduct such transfers.  (Pl.'s 56.1Resp. at ¶ 7.)  Defendants contend, however, that the August 2006 meeting marked a new policy shift toward aggressively enforcing the driving rules. According to Kimberly Kemper, rigorous implementation of the driving policy was "a big deal" and a "significant change for the organization . . . because management said that we needed to curb motor vehicle accidents."  (Kemper Dep. at 51.)  There is no evidence in the record to indicate whether there had been a history of motor vehicle accidents among SOI workers.

Marcinkiewicz claims that, following the August 2006 meeting, he instructed store managers in his territory that "going forward, all product transfers between stores had to be approved and performed by me and that violations would not be tolerated, with the consequences to include termination."  (Marcinkiewicz Dec. ¶ 12.)  Plaintiffs were not present at the August 2006 meeting, and they assert that they were never informed of any new policy for aggressively enforcing the long-neglected driving and transfer regulations.  There is no evidence that Marcinkiewicz ever spoke directly with either Vasant or Prafulla about the policy change.  William Szenda testified that he told Prafulla that "we couldn't move product anymore ourselves, that we needed to have Brad [Marcinkiewicz] do it." (Szenda Dep. at 34.)  But Prafulla testified that while she understood that "[territory managers] only can move [inventory]," she continued to believe that "everybody" still ignored the SOPs. (P. Thakkar Dep at 59.)[8]  Prafulla testified that she was personally aware that Robert Stewart, an assistant manager at another store, violated the policy after August 2006

---

[8]        Szenda claims to have made clear to Prafulla that penalties for violating the driving policy could be "up to and including termination," but Prafulla was assertedly unaware of this stiff prospective penalty.  (Szenda Dep. at 72.)

because she had seen Stewart pick up items from the Naperville store. (*Id.* at 58-59.) On one occasion after Szenda informed Prafulla of the stricter rules, Prafulla broached the issue with Marcinkiewicz because she wanted to purchase some item for her store.[9] According to Prafulla, Marcinkiewicz was nonchalant, telling her, "Oh, you know, if you want to go and buy it, buy it." (P. Thakkar Dep. at 60.)

Vasant testified that he was never told anything about the new driving or transfer policies by anyone, and that he was aware of several employees who regularly drove in pursuit of company business and transferred products without authorization after August 2006. (V. Thakkat Dep. 141-44.) Vasant testified that he was personally aware that Bissias, Stewart, Assistant Manager Jim Cruz, and Manager Florin Coman had all violated the driving policy, "but [Marcinkiewicz] never took action against anyone." (*Id.* at 144.) The various company documents signed by Plaintiffs over the course of their employment make no specific mention of the driving rules. Nor are the driving rules set forth in the employee handbook. It is undisputed that, before August 2006, both Plaintiffs had transferred inventory and had driven in pursuit of company business at the request and instruction of their supervisors. (Pl.'s 56.1 Resp. at ¶ 17.)

### C.  Plaintiff's Violation of the Driving Rules

On February 16, 2007, four days before Vasant's second complaint against Bissias was closed without action, both Vasant and Prafulla were terminated by SOI for insubordination and violation of company policies and safety procedures. The incident cited as the reason for their terminations began just three days after Vasant lodged his second complaint, on the morning of January 20, 2007, when Vasant realized that the Aurora station had run out of windshield wiper fluid. (Pl.'s 56.1 Resp. at ¶ 33.) The shortage was the result of an ordering error made by Bissias earlier in the week. (*Id.* at ¶ 34.) Upon discovering the shortage, Vasant telephoned Prafulla at the

---

[9]     Prafulla did not say precisely when this conversation with Marcinkiewicz took place, but she asserts that it occurred some time after she learned of the driving policies from Szenda.

Naperville station and asked if her store had extra fluid. (V. Thakkar Dep. 123-124.) Prafulla reported that the Naperville store had five surplus cases that she was willing to transfer to Aurora, and she and Vasant agreed that they would need permission from their respective store managers to transfer the surplus cases. (*Id.* at 124.)

Vasant telephoned Bissias at home to explain the situation and obtain permission for the transfer. Vasant and Bissias give sharply conflicting accounts of the ensuing conversation. According to Vasant, Bissias immediately approved the transfer of the five cases but added: "But [Prafulla] cannot drive." (V. Thakkar Dep. at 124.) Vasant then asked, "Yes, but by going home [after the end of her shift], can she drop by here?" (*Id.* at 124-25.)[10] According to Vasant, Bissias then told him "Okay. That's fine." (*Id.* at 125.) Bissias denies giving Vasant approval to drive or transfer the cases. Rather, Bissias testified that she unequivocally ordered Vasant not to transfer the boxes: "[Vasant] asked if they could transfer windshield washer fluid, him and his wife, and I stated no, it is against company policy." (Bissias Dep. at 67-68.) According to Bissias's account, she told Vasant that Marcinkiewicz was the only person who could authorize the transfer and, since Marcinkiewicz was out of town that day, there was no way to move the cases. (*Id.* at 116.) Vasant argued, "well, [Prafulla] can bring it here on her way home from work," but Bissias again refused and stated that it would still violate company policy. (*Id.*) Vasant replied, "but she'll be off the clock." Bissias claims she ended the conversation by saying, "It is still transferring product from store to store, you cannot do that." (*Id.*)

Prafulla simultaneously telephoned her store manager, William Szenda, at his home to ask permission to transfer the cases of fluid. According to Szenda, Prafulla "told me that five cases

---

[10]    While the court draws all reasonable inferences in the Plaintiffs' favor with regard to their contention that they were not adequately informed of the driving restrictions, Plaintiffs' decision to seek permission from their supervisors indicates that they were at least marginally aware that some authorization was required for employees driving between stores for business purposes. Vasant's claimed response to Bissias also suggests he was aware that the rule had something to do with driving in the scope of employment.

were going, but she did not tell me that she was taking it." (Szenda Dep. at 43.) Szenda testified

that he assumed that Bissias would arrange for some authorized means of transferring the cases

that did not involve Prafulla's driving. (*Id.* at 44.) "I knew that there was no way that Prafulla could

lift up and put five cases of washer fluid in her trunk so I wasn't worried about it," Szenda said. (*Id.*)

Purportedly unaware that Prafulla intended to deliver the cases herself, Szenda told Prafulla that

"if it was okay with Kelly [Bissias], then it was okay with [him]." (*Id.* at 44.) After finishing her shift,

Prafulla did, in fact, drive the five cases from the Naperville station to the Aurora station. (Pl.'s 56.1

Resp. at ¶ 41.) Bissias testified that she determined that Vasant and Prafulla had made the transfer

when she arrived at work on the evening of January 20, 2007 and realized that the Aurora store

was supplied with windshield fluid. (Bissias Dep. at 122.) Bissias nevertheless did not report or

discuss the transfer with anyone else at SOI or Exxon until January 26.

On January 27, 2007, when the Aurora store received its next full shipment of windshield

fluid, Vasant loaded five cases into his car and drove them to the service station in Naperville to

replace the ones he'd borrowed. (*Id.* at ¶ 43.) Vasant testified that Bissias had also approved this

second trip. (V. Thakkar Dep. at 139.) According to Vasant, Bissias came out of the store while

he was loading the cases into his car, and Vasant told her, "I told you that we have to return the five

box[es] of windshield washer fluid to [the Naperville store], and I have [them] in my car, so while

going home I will drop the boxes." (*Id.*) Vasant testified that Bissias replied, "okay." (*Id.*) Again,

Bissias's testimony differs substantially from Vasant's. According to Bissias, she asked Vasant

on the day in question if he planned to take any cases back to the Naperville store, but Vasant

ignored her and walked out of the store. (Bissias Dep. at 149-50.) A short while later, as she was

in her office, Bissias "overheard two employees talking and I heard one of them say, you know,

Vasant put the cases into his car and took them back to his wife's store." (*Id.* at 149.) Bissias did

10

not name the other employees and neither one testified in connection with this incident.[11]

### D. The Company's Investigation

On January 26, 2007, Bissias called Marcinkiewicz and informed him that Prafulla and Vasant had violated the driving and transfer rules. (Pl.'s 56.1 Resp. at ¶ 44.) Bissias called Marcinkiewicz again the next day, January 27, to report that Vasant had again driven without authorization to return five cases of fluid to the Naperville store. (*Id.* at ¶ 45.)

The following Monday, January 29, Marcinkiewicz opened an investigation into whether Plaintiffs had violated any rules, but Marcinkiewicz did not actually interview Vasant or Prafulla until February 11 or 12. (*Id.* at ¶ 46.)[12] On or around February 11, Marcinkiewicz interviewed Prafulla at the Naperville store. (P. Thakkar Dep. at 63.) Prafulla admitted to transferring the cases, but she maintained that Bissias and Szenda had authorized the transfer and that other employees regularly drove and transferred inventory without any authorization. (*Id.* at 63-65.) Prafulla specifically identified Bissias and Stewart as employees who regularly drove and transferred products without authorization. (*Id.* at 64-65.)

On February 12, Kemper and Marcinkiewicz held a meeting with Vasant at the Aurora store. (*Id.* at ¶ 45; V. Thakkar Dep. at 145.) It is undisputed that Kemper led off the meeting with a discussion of the complaints Vasant had raised in his letter of January 17. (Pl.'s 56.1 Resp. at ¶ 44.) According to Vasant, Kemper said, "We investigated everything, and whatever you stated in your letter and everything [Bissias] is doing is okay." (V. Thakkar Dep. at 114-15.) The meeting

---

[11] From the court's review of the record, it appears that one of the employees that Bissias overheard was Nick Patel. (Bissias Dep. Ex 9.) The last name of the other employee, who appears to be male with the first name of "Kim," is not immediately clear. (*Id.*)

[12] It appears from the record that Marcinkiewicz's delay in speaking to Vasant resulted both from Marcinkiewicz's failure to contact Vasant between Jan. 26 and Feb. 4, when Vasant was regularly working, and from the fact that the Thakkars were on vacation from Feb. 5 through Feb. 11. Plaintiffs contend that the initial delay is a suspicious circumstance that puts the legitimacy of the investigation into question.

then turned to the topic of the inventory transfer. Vasant admitted that he and Prafulla had driven cases of fluid back and forth between their two stores, but he maintained that he did so with Bissias's permission. (Pl.'s 56.1 Resp. at ¶ 52.) Bissias was then called into the meeting, where she denied giving Vasant permission to drive or transfer the product. (V. Thakkar Dep. at 146.) At the close of the meeting, Marcinkiewicz informed Vasant that the company was suspending him pending further investigation. (Pl.'s 56.1 Resp. at ¶ 55.)

As part of his investigation, Marcinkiewicz interviewed Szenda by telephone. (*Id.* at ¶ 56; Marcinkiewicz Dep. at 65; Szenda Dep. at 47-48, 57-58.) Szenda told Marcinkiewicz that he opposed any move to suspend or sanction Prafulla. (Szenda Dep. at 54-57.) During the years that Szenda had been Prafulla's supervisor, he had never known her to violate any rule and, in his estimation, Prafulla "was a very good worker." (*Id.* at 56-57.) Szenda told Marcinkiewicz that he believed other employees, including Assistant Managers Robert Stewart and Jim Cruz, had repeatedly driven and transferred inventory without being punished. (*Id.* at 54.) Whether Szenda and Marcinkiewicz discussed the dates of these events is unclear; Szenda admitted in his deposition that he did not personally witness Stewart or Cruz violating the driving policy after August 2006. (*Id.* at 67-68.)

Marcinkiewicz claims he interviewed Stewart and Cruz with regard to Prafulla's and Szenda's allegations and that both men denied ever violating the policy.[13] (Marcinkiewicz Dep. at 93-99.) In his deposition in this case, Stewart admitted to violating the driving policy on several occasions, including in the Fall of 2007. (Stewart Dep. at 14-15.) Cruz also admitted to violating the driving policy in "early '06" and stated that he was personally aware of other employees violating the policy well into 2007. (Cruz Dep. at 14-18.) Stewart and Cruz both denied that Marcinkiewicz

---

[13]     There is no evidence that Marcinkiewicz ever asked Bissias whether she herself violated the driving policy, as Prafulla alleged, although the record indicates that Marcinkiewicz had several discussions with Bissias about the fate of the Thakkars.

had interviewed them, as he claimed. (Stewart Aff. at ¶ 7-8; Cruz Aff. at ¶ 6.) Had Marcinkiewicz interviewed him, Stewart observed, he would readily have admitted to breaking the driving rules. (Stewart Aff. at ¶ 7.) Stewart and Cruz were never subjected to any discipline for violating the rules. Stewart is Caucasian and identifies himself as Christian. He is four years older than Plaintiffs. (V. Thakkar Dep. at 157-58.) Cruz, who is also Caucasian, reported that he was 26 years old in May 2009. (Cruz Aff. at ¶ 1; Marcinkiewicz Dep. at 94.)

Following his brief investigation into the Thakkars' conduct, Marcinkiewicz conferred with Kemper and VanDuivendyk and decided to terminate both Vasant and Prafulla. He notified the Thakkars of their dismissal by telephone on February 16, 2007. Marcinkiewicz admitted that he knew of no other employee in his territory that had ever been disciplined or terminated for violating the driving rules. (Marcinkiewicz Dep. at 123.) According to Kemper, Staffing Specialist Sandy Deacon and Manager Florin Coman (both Caucasian) were issued written warnings for violating the driving rules in 2005. (Kemper Dep. at 37-41, 71.) Copies of those warnings are not in the record. Other than Plaintiffs, the sole SOI employee identified as ever having been terminated for violating any health and safety rule is former Store Manager Hamid Khyum. (*Id.* at 61-63.) Khyum, who is Asian, was fired in December 2006 for failing to report a subordinate's injury. (*Id.* at 62.) Khyum's religion and country of origin are not in the record, and Kemper did not identify the individual(s) who made the decision to discharge Khyum.

## II.    Plaintiffs' Promotion Claim

Plaintiffs also advance a separate discrimination claim based on Defendants' failure to promote either Prafulla or Vasant to store manager over the course of their tenures with SOI. Marcinkiewicz acknowledged that, aside from the driving incident, Vasant and Pafulla were good employees who would have been eligible for promotion had they sought it. (Def. 56.1 Resp. at ¶ 30.) Before his conflicts with Bissias, Vasant had received the highest possible competency ratings in his evaluations. (*Id.* at ¶ 38.) He had also briefly filled in as acting manager of the Aurora store

13

before Bissias was hired in 2005. (*Id.*) Prafulla also had the best possible ratings. (*Id.*) While Vasant stated that he recalled having one or two passing conversations about promotion with a former store manager prior to 2004, he admitted that he never expressed any interest in being promoted to Marcinkiewicz or anyone else with the power to promote him. (V. Thakkar at 54-56.) Prafulla never expressed an interest in being promoted to anyone. (P. Thakkar Dep. at 72-73.)

### III.     Vasant's Replacement as Assistant Manager

Following Plaintiffs' terminations, Nick Patel replaced Vasant as assistant store manager under Kelly Bissias in Aurora. (V. Thakkar Dep. 64-65, 108-09; Bissias Dec. ¶ 6.) Patel is of Indian descent and Hindu, and is one year older than Vasant. (Pl.'s 56.1 Resp. at ¶ 69.) In their brief in support of summary judgment, Defendants initially argued that the selection of Patel to replace Vasant undermined any inference that Defendants were "looking to get rid of Indian and/or older employees." (Def. Mem. at 10-11.) In response, Plaintiffs now seek to supplement the record with Patel's affidavit, in which he claims that he too suffered discrimination at the hands of Bissias. (Patel Aff. at ¶ 4.) According to Patel, while working under Bissias in 2008, he was forced on two occasions to work in excess of seven consecutive days without a day off. (*Id.* at ¶ 5.) Presumably referring to himself and Vasant, Patel further states: "To my knowledge, only East Indian employees have been required to work in excess of seven days in a row." When he complained about what he saw as Bissias's discriminatory treatment of Indian employees, Patel stated, he was transferred against his will to a less desirable store location and subsequently suspended. (*Id.* at ¶ 4.) Patel currently has his own discrimination charge pending against Defendants before the Illinois Department of Human Rights. (*Id.* at ¶ 7.)

Defendants object to Patel's affidavit as conclusory and irrelevant, as Patel speculates on Defendants' motives and the events that he describes occurred after Plaintiffs' terminations. In the alternative, Defendants seek to rebut Patel's affidavit by introducing a statement from Exxon Territory Manager Ruchika Deora, who replaced Marcinkiewicz in January 2008. (Deora Aff. ¶¶ 1-

14

2.)  Deora, who is of Indian descent, states that Patel was transferred and suspended for performance reasons and, in her view, Bissias had likely assigned Patel to work more than seven days in a row in error.  (*Id.* at 5-10.)  According to Deora, SOI managers frequently "ask employees to fill in for an employee who calls in sick . . . [and] it is my understanding that if [Patel] worked seven days in a row, it was because he did so voluntarily [and failed to alert Bissias to the mistake]."  (*Id.* at 10.)  There is no evidence that any employee called in sick during the periods in which Vasant or Patel were assigned to work in excess of seven consecutive days.

The court now turns to its consideration of Plaintiffs' motion to supplement the record and Defendants' motion for summary judgment.

## DISCUSSION

## I.    Summary Judgment Standard

A motion for summary judgment shall be granted where the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED R. CIV. P. 56(c).  When ruling on a summary judgment motion, the court credits all admissible evidence presented by the nonmoving party and draws all justifiable inferences in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489-90 (7th Cir. 2007).  The court does not assess the credibility of witnesses or weigh evidence.  *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005).  The function of summary judgment is not to determine the truth of the matters presented in a case, but, instead, to determine whether there is a genuine issue for trial and "to isolate and dispose of factually unsupported claims."  *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001); *Hemsworth*, 476 F.3d at 490.  Summary judgment is not appropriate if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248; see also *Alexander v. Wisconsin Dep't of Health & Family Services*, 263 F.3d 673, 681 (7th Cir. 2001) (noting that there

15

is no heightened summary judgment standard in employment discrimination cases). The court considers the pending motions with these standards in mind.

## II.    Patel's Affidavit

Before addressing the substance of Plaintiffs' claims, the court must determine whether it may properly consider the affidavit of Nick Patel. Only evidence that would be admissible at trial may be used to support or resist the grant of summary judgment. FED. R. CIV. P. 56(c). A supporting affidavit may only be considered, therefore, if it is based upon the personal knowledge of the affiant, including inferential knowledge based on personal experience. *Id*; *Visser v. Packer Engineering Associates, Inc.,* 924 F.2d 655, 659 (7th Cir. 1991)( to be admissible, an affidavit be "grounded in observation or other first-hand personal experience" rather than in "flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from personal experience."). Patel's affidavit occasionally crosses the line into conclusions or impermissible conjecture about Defendants' motives. For example, paragraph four of the affidavit states:

> [A]fter I was promoted to assistant store manager, I was subjected to discrimination based on my race and national origin. In mid January 2009, I complained to my territory manager about the way my territory manager Kelly Bissias treated me because of my national origin. In retaliation for this complaint, I was transferred against my wishes to another store at a less desirable location.

(Patel Aff. at ¶ 4.) In paragraph six, Patel again complains of unspecified "discriminatory conditions" which he claims contributed to a work environment that was "hostile and intolerable." The affidavit largely fails to specify what treatment Patel received or any other facts from which Patel could infer the alleged discriminatory purpose. "Discrimination law would be unmanageable if disgruntled employees–the friends of the plaintiff and often people in the same legal position as the plaintiff–could defeat summary judgment by affidavits speculating about the defendant's motives." *Visser*, 924 F.2d at 659. For this reason, paragraphs four and six of Patel's affidavit, which constitute unsubstantiated speculation about Defendants' motives and conclusory legal statements are stricken.

Patel's affidavit is not wholly devoid of specific first-hand observations, however. In Paragraph 5, Patel states: "I was required by ExxonMobil to work in excess of seven days in a row on two occasions . . . . To my knowledge only East Indian Employees have been required to work in excess of seven days in a row." This is a factual statement based on first-hand knowledge. Further, Patel's statement is relevant to Plaintiffs' claims. Defendants opened the door to the court's consideration of Patel's work experiences by presenting Patel's promotion to assistant store manager as evidence defeating an inference that Vasant's termination was motivated by discriminatory animus.[14] Patel is a member of the same racial, national-origin, religious and age group as Plaintiffs. He and Vasant were subject to similar consecutive-day scheduling demands while answering to the same supervisor, Defendant Kelly Bissias. Neither party has identified any other SOI/Exxon employee who was similarly subjected to the lengthy consecutive-day work schedules that Patel and Vasant complain of. Paragraph 5 of Patel's affidavit, describing a similar act of potential discrimination, is admissible. *See Shager v. Upjohn Co.*, 913 F.2d 398, 402-03 (7th Cir. 1990).[15]

Plaintiffs' motion to supplement the record is granted in part and denied in part. Plaintiffs are permitted to file Patel's affidavit and to amend their Rule 56.1(b)(3)(C) statements of fact based on paragraphs one, two, three, five, and seven of the affidavit. Paragraphs four and six and any

---

[14] Notably, Defendants failed to disclose that Patel had ever asserted any claims of discrimination against Bissias, despite Plaintiffs' interrogatories aimed at uncovering similar complaints by other Indian employees of SOI/Exxon. Defendants' failure to disclose Patel's charge of discrimination blunts the impact of Patel's promotion as evidence rebutting Plaintiffs' claims.

[15] The court recognizes the risk of confusion and delay generated by consideration of claims of discriminatory asserted by nonparty witnesses. *See Visser*, 924 F.2d at 659-660. For that reason, in addition to those listed above, the court considers only the scheduling issue raised by Patel. The court will not consider the EEOC form attached as Exhibit A to Patel's affidavit. Nor is the court inclined to consider the responsive affidavit of Ruchika Deora. Assuming it is admissible, Deora's suggestion that scheduling Patel for more than seven consecutive work days constituted an innocent mistake does nothing to undermine Patel's statement. It merely raises a question of fact that the court must resolve in Plaintiffs' favor at the summary judgment stage.

statements of fact based on those paragraphs, however, are inadmissible.

**III.     Plaintiffs' Discrimination Claims**

    **A.     Unlawful Termination**

Counts I, II, and III of the complaint assert that Defendants violated Title VII, Section 1981, and the ADEA by terminating Plaintiffs. Under these provisions, a plaintiff may attempt to demonstrate her discrimination claim by relying on either the direct or indirect methods of proof. *Brown v. Illinois Dep't of Natural Res.*, 499 F.3d 675, 681 (7th Cir. 2007); *Bennett v. Roberts*, 295 F.3d 687, 697 (7th Cir. 2002) ("The same standards governing liability under Title VII apply to § 1981.") Plaintiffs seek to proceed under the indirect or burden-shifting method, initially outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 803 (1973). In order to create an inference of discrimination under this method, Plaintiffs must offer evidence showing that: (1) they belong to a protected class; (2) they were meeting their employer's legitimate job expectations; (3) they suffered an adverse employment action; and (4) similarly situated employees outside of the protected class were treated more favorably by the employer. *See, e.g., Atanus v. Perry*, 520 F.3d 662, 672-73 (7th Cir. 2007)*; Timm v. Illinois Dep't of Corrections*, 335 Fed. Appx. 637, 642 (7th Cir. 2009). If Plaintiffs establish this prima facie case, Defendants may offer evidence to provide a legitimate, nondiscriminatory reason for the employment decision. *Germano v. Int'l Profit Ass'n, Inc.*, 544 F.3d 798, 807 (7th Cir. 2008). If Defendants are able to do so, Plaintiffs can survive summary judgment by presenting evidence that the proffered explanation is merely a pretext for discrimination. *Bannon v. Univ. of Chicago*, 503 F.3d 623, 631 (7th Cir. 2007). Pretext means "deceit used to cover one's tracks." *Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1006 (7th Cir. 2002). In other words, Plaintiffs must show that Defendants' proffered explanation is "a lie, specifically a phony reason" supporting termination. *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995).

There is no dispute that Plaintiffs are members of a protected class and that their

termination constitutes an adverse employment action. Defendants do challenge Plaintiffs' ability to establish the second and fourth prongs of the prima facie case, and argue that Plaintiffs' violation of the driving rules constitutes a legitimate, nondiscriminatory reason for termination. Plaintiffs admit they violated the rules, but they contend that the rules were not actively enforced against other employees and represent a mere pretext for their termination. In support, Plaintiffs point to the unprecedented severity of their punishment and Defendants' inconsistent enforcement of the rules.[16] The separate prongs of the *McDonnell Douglas* inquiry are not "hermetically sealed off from one another." *Pantoja v. American NTN Bearing Mfg. Corp.*, 495 F.3d 840, 846 (7th Cir. 2007). In cases like this one, when a plaintiff alleges that job expectations such as adherence to internal rules were deployed in a discriminatory manner, the second and fourth prongs of the prima facie analysis may merge. *Id.* "Under that scenario, the plaintiff may survive summary judgment merely by showing that similarly situated employees who also failed to meet the employer's legitimate expectations were treated more favorably." *King v. City of Chicago*, No. 04 C 7796, 2007 WL 4365325, *5 (N.D. Ill. Dec. 11, 2007) (citing *Pantoja*, 495 F.3d at 846). This analysis also informs the court's consideration of whether Defendants' explanations are pretextual. *See Senske v. Sybase, Inc.*, 588 F.3d 501, 507 (7th Cir. 2009) ("But here [the plaintiff] argues that [his employer] is lying about its legitimate employment expectations in order to set up a false rationale for terminating him. Accordingly, the question of whether he was meeting [the employer's] legitimate expectations merges with the question of whether [the employer's] reasons for firing [the plaintiff]

---

[16] These factors are only valuable to the court's consideration to the extent that they demonstrate whether Defendants' explanation is *legitimate*. The court's role is not to sit as a super-personnel department to review Defendants' employment decisions. *Ghosh v. Ind. Dep't of Envtl. Mgmt.*, 192 F.3d 1087, 1093 (7th Cir. 1999). Its task is not to second guess SOI's investigative or disciplinary processes, but only to determine whether Plaintiffs were, in fact, discharged for a discriminatory reason. *See Logan v. Caterpillar, Inc.*, 246 F.3d 912, 921 (7th Cir. 2001); *Giannopoulos v. Brach & Brock Confections Inc.*, 109 F.3d 406, 410 (7th Cir. 1997) ("When an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination.")

are pretextual.")[17]

Plaintiffs have presented sufficient evidence, in the form of their own testimony and that of other employees, to demonstrate that the driving rules were neither consistently respected by SOI employees nor actively enforced by SOI management. Defendants do not dispute that, while the driving rules were in effect prior to August 2006, it was common practice even for senior employees to violate them. It is similarly undisputed that, prior to August 2006, Plaintiffs had been instructed to violate the rules by their own store managers. Defendants contend that the lax approach to the driving rules changed in August 2006, when Marcinkiewicz attempted to implement stricter enforcement. But Plaintiffs testified that Marcinkiewicz never spoke to them about any change, and there is no evidence that he or any other SOI manager issued any written directive concerning the new, stricter enforcement policies. Though Prafulla admitted to some familiarity with the driving rules, she stated that she believed the rules meant nothing in practice because they were regularly disregarded by other employees. On the one occasion after August 2006 when Prafulla sought Marcinkiewicz's authorization under the rule, Marcinkiewicz's nonchalant response ("Oh, you know, if you want to buy it, buy it") could be construed as suggesting that authorization was not even required. At the least, such a comment is inconsistent with the aggressive enforcement approach Marcinkiewicz now claims to have taken. Vasant testified that he was never told about any strict approach to the driving rules. In fact, according to Vasant, his immediate superior, Bissias, approved of and instructed him to perform the very driving/transfer act for which he was ultimately fired.

Plaintiffs have identified at least one similarly situated Caucasian employee, Robert Stewart,

---

[17]     The Seventh Circuit has warned against "the specter of an infinitely regressing set of *McDonnell Douglas* inquires," that can result from collapsing the separate considerations under the indirect method. *Pantoja*, 495 F.3d at 846. The court bears this concern in mind while considering the substantially related, though not identical, questions of whether the driving rules were selectively enforced against Plaintiffs and whether Defendants' proffered explanation for terminating Plaintiffs is pretextual.

who was treated more favorably by Defendants. The similarly situated requirement "normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in such similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000). This standard is a "flexible one," which requires a plaintiff to show "substantial similarity" rather than "complete identity" with another employee. *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 404-05 (7th Cir. 2006); *McGowan v. Deere & Co.*, 581 F.3d 575, 579 (7th Cir. 2009) ("this test involves a flexible, common-sense approach with requirements that vary from case to case"). Like Plaintiffs, Stewart was subject to the driving rules and reported to Marcinkiewicz. Stewart testified that he violated the driving rules with impunity before and after August 2006. There is evidence that Marcinkiewicz was aware of allegations that Stewart had broken the rules after August 2006: both Prafulla and Szenda identified Stewart by name when Marcinkiewicz questioned them on the topic in February 2007, and Marcinkiewicz himself testified that he took these accusations seriously. Marcinkiewicz claimed to have interviewed Stewart, who, Marcinkiewicz said, denied ever violating the driving rules. In urging that Stewart is not an appropriate comparator to Plaintiffs, Defendants emphasize that Stewart denied violating the rules and Plaintiffs admitted to it. The problem for Defendants, however, is that Stewart testified that Marcinkiewicz never interviewed him about the matter at all, but, if he had, Stewart would have freely admitted the truth: that he thought little of the driving rules and regularly violated them.

Marcinkiewicz opted to terminate Plaintiffs for their infraction, even though the rules had never been strictly enforced against anyone before and Plaintiffs plausibly claimed to have acted with the consent of their superiors. There is evidence that Stewart was never disciplined for his identical behavior (nor even questioned about it, if Stewart's testimony is to be believed). This potentially disparate treatment is sufficient to satisfy the prima facie case for Plaintiffs' Title VII and

Section 1981 claims.

Plaintiffs can survive summary judgment on their race discrimination claims by pointing to evidence that a discriminatory reason more likely motivated their terminations or by showing that Defendants' explanation is unworthy of credence. *Senske*, 588 F.3d at 507. In certain cases, an employer's explanation may also be so "fishy and suspicious" as to make summary judgment inappropriate. *Fischer v. Avanade, Inc.*, 519 F.3d 393, 403 (7th Cir. 2008). Plaintiffs have done enough in this instance–by producing evidence of disparate treatment and demonstrating inconsistencies in Marcinkiewicz's testimony with regard to that treatment–to raise a material question of fact about Defendants' motives. The evidence shows that Marcinkiewicz did not uniformly enforce the driving rules, and the punishment he assigned to Plaintiffs was entirely unprecedented. There is also no dispute that, aside from the driving infraction, Plaintiffs were performing their jobs well. Both Plaintiffs regularly received the highest possible performance ratings and had nearly pristine disciplinary records.[18] Even Marcinkiewicz considered Vasant and Prafulla to be excellent employees.[19] Yet, Plaintiffs were terminated without a warning for violating a rule that Defendants admit had previously been almost entirely unenforced. The combination of Plaintiffs' outstanding record of performance, the selective nature with which the driving rules were apparently applied, and the suspicious and disputed circumstances of Plaintiffs' discharge permit the inference that the rule violation was merely a pretext for Plaintiffs' terminations, rather than an genuine failure on Plaintiffs' part to satisfy Defendants' bona fide job expectations. Plaintiffs' Title

---

[18] Vasant had been issued a letter of reprimand by Marcinkiewicz in connection with his first complaint against Bissias, but a reasonable jury could conclude that Vasant's complaint was prompted by genuine concern for his employer and the disciplinary action was not warranted.

[19] This situation is distinct from the cases cited by Defendants, where summary judgment was appropriate against employees who had lengthy track records of rule violations and unacceptable conduct for which they were ultimately terminated. *Cf. Wingo v. Thyssenkrupp Materials NA, Inc.*, No. 08 C 368, 2008 WL 4696130, *3(N.D. Ill. Oct. 23, 2008) (employer entitled to summary judgment against employee who been disciplined "several times in the final six months of his employment" for various violations.)

VII and Section 1981 claims for disparate treatment and unlawful termination based on racial, religious, and national-origin discrimination survive summary judgment.

Plaintiffs' ADEA discrimination claims fail, however, for lack of any evidence of more favorable treatment of younger workers. Marcinkiewicz claims he was unaware that Stewart violated the driving rules. Plaintiffs challenge this, but even if it is not true, Stewart's more favorable treatment does not establish age discrimination because Stewart is older than either Plaintiff is. Nor is Cruz a suitable comparator. He stated only that he violated the rules in "early 2006," suggesting that he did not violate them after the August 2006 shift in policy. Plaintiffs have not identified any younger employee treated more favorably, and their age discrimination claims, set forth in Count III, are dismissed.

### B. Denial of Promotion

Count II of the complaint also contains a Section 1981 claim for Defendants' failure to promote either Plaintiff to the position of store manager and for delaying Prafulla's promotion to assistant manager. To establish the prima facie case for failure to promote in this Circuit, a plaintiff must show that: (1) she is a member of a protected class; (2) she is qualified for the position; (3) she was rejected for the position; and (4) the position was given to someone outside the protected class who was similarly or less qualified than she. *Hobbs v. City of Chicago*, 573 F.3d 454, 461-62 (7th Cir. 2009) (adding that, to show that an employer's reason for choosing another candidate for promotion is a pretext, plaintiff must show he was "clearly better qualified" than the favored candidate). In addition, the plaintiff must show that there was, in fact, an open position into which she could have been promoted. *Jones v. City of Springfield, Ill.*, 554 F.3d 669, 673 (7th Cir. 2009); *Howard v. Lear Corp. EEDS & Interiors*, 234 F.3d 1002, 1005-06 (7th Cir. 2000) (defining the second prong of the prima facie case to require that plaintiff "applied for, and was qualified for an open position."). Plaintiffs have failed to meet the prima facie requirements here.

There is no evidence in the record that either Plaintiff sought advancement and was

23

rejected. Plaintiffs have not identified specific positions they sought to obtain nor presented any evidence of efforts on their part to request a promotion. At best, Vasant said he thought he remembered having one or two conversations on the topic of promotion with his store manager prior to 2004. Prafulla testified that she never expressed any interest in being promoted. Neither Plaintiff ever actually applied for any promotion or discussed the possibility with any territory manager, the actor responsible for advancement decisions.

Nor have Plaintiffs seriously attempted to satisfy the fourth prong of the prima facie requirements. The only store manager who Plaintiffs identify as potentially less qualified than Plaintiffs is Bissias. There is very little evidence in the record concerning Bissias's qualifications, but what little there is suggests she did have prior employment experience as a permanent, full-time store manager at a competing gas-station franchise. (Bissias Dep. at 5.) Neither Plaintiff had commensurate experience at SOI. Plaintiffs' Section 1981 claim for denial of promotion fails to meet the prima facie requirements.[20] Defendants' motion for summary judgment is granted in part. Plaintiffs' claims based on Defendants' failure to promote them are dismissed.

### C. Consecutive Day Scheduling

Count II also contains a claim that Defendants violated Section 1981 by scheduling Vasant, alone among employees in Bissias's charge, to work ten consecutive days over his objection and in violation of Illinois's One Day Rest in Seven law. 820 ILCS 140/6.[21] The key facts are not in dispute. Vasant's assigned schedule included Christmas Eve and Christmas Day in 2006, and overnight on New Year's Eve 2006 and New Year's Day 2007. Bissias, who assigned the work schedule, took these holidays off. Vasant was assigned this complained-of schedule on one

---

[20] Plaintiffs make no attempt in their briefs to explain or defend Prafulla's claim based on a "delay" of promotion to assistant manager. Accordingly, that claim is also dismissed.

[21] Plaintiffs do not assert an independent claim based the One Day Rest in Seven Act alone, nor could they. The Act charges the Illinois Director of Labor with enforcement and does not create a private right of action in individual employees. 820 ILCS 140/6-9.

occasion. He alleges no impropriety with regard to scheduling during the rest of his tenure at SOI. The record reflects that no other employee under Bissias or Marcinkiewicz has ever been scheduled to work more than seven consecutive days except for Nick Patel, who is also Indian and Hindu.

Bissias's assignment of an unfavorable work schedule to Vasant could be seen as evidence of Bissias's animus toward Vasant, and perhaps against Indian employees more generally. The court does not condone any abusive employment practice, or violation of Illinois law, but at least in traditional employment discrimination cases such as this one, the one-time assignment of an unfavorable weekly work schedule is not an adverse employment action that supports an independent discrimination claim. *See Lewis v. City of Chicago*, 496 F.3d 645, 653 (7th Cir. 2007) ("We do not condone bigotry or hatred, but we are interpreting an employment discrimination statute, not canons of individual virtue.")

The purpose of the adverse employment action requirement is to provide a reasonable limiting principle for the type of conduct that constitutes actionable discrimination. *Phelan v. Cook County*, 463 F.3d 773, 780 (7th Cir. 2006). "Although we define adverse employment broadly, not everything that makes an employee unhappy is an actionable adverse employment action. For an employment action to be actionable, it must be a *significant* change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibility, or a decision causing a significant change in benefits." *Lewis*, 496 F.3d at 653 (7th Cir. 2007) (quoting *Bell v. Environmental Protection Agency*, 232 F.3d 546, 555 (7th Cir. 2000)) (emphasis added). The Seventh Circuit has stated that adverse employment actions may be categorized into three groups of cases involving: (1) the employee's compensation or benefits; (2) the employee's career prospects; and (3) changes to the employee's work conditions that subject him to "humiliating, degrading, unsafe, unhealthy or otherwise significant negative alteration" in his work place environment. *Lewis*, 496 F.3d at 653 (quoting *Herrnreiter v. Chicago Housing Authority*, 315 F.3d

25

742, 744-45 (7th Cir. 2002)).

The one-time assignment of ten consecutive work days is not significant enough to constitute adverse action under this standard. The undesirable scheduling did not impact Vasant's wealth or his future opportunities at SOI. It was not so systematic or repetitive that it seriously altered the conditions of Vasant's employment, and was not so extreme as to be degrading, unsafe, or unhealthy. Rather, it appears to have been a modestly undesirable, but temporary, work condition. Few people enjoy working long hours or on holidays, but the singular assignment of a handful of unattractive work days does not constitute an adverse employment action for purposes of Section 1981. Vasant's claim based on his consecutive-day work schedule is dismissed.

### D. Plaintiffs' Claims for Punitive Damages

Plaintiffs concede that, typically, a party cannot separately recover punitive damages under both Title VII and Section 1981, but they nevertheless seek recovery of punitive damages under both provisions. Plaintiffs contend that they are entitled to do so without running afoul of 42 U.S.C. §1981a(a)(1), which permits recovery of punitive damages under Title VII only when "the complaining party cannot recover under Section 1981," because their Title VII claim (unlawful discharge) and Section 1981 claim (disparate enforcement of company rules) raise "separate factual issues." The court is not persuaded. The record indicates that both of these claims arise from the same series of operative facts. Permitting Plaintiff to simultaneously seek punitive damages under both provisions would potentially enable the very kind of double recovery that §1981a(a)(1) seeks to avoid. Accordingly, if Plaintiffs prevail at trial, they will not be permitted to recover punitive damages under both Section 1981 and Title VII.

### IV. Plaintiffs' State Law Claims

### A. Retaliatory Discharge

Plaintiffs also contend that they were terminated unlawfully in retaliation for Vasant's

complaint letter of January 17.[22]  Illinois common law recognizes a "limited and narrow cause of action for the tort of retaliatory discharge" as an exception to the general rule that employers may fire at-will employees for any and no reason at all.  *Turner v. Memorial Medical Center*, 233 Ill. 2d 494, 500, 911 N.E.2d 369, 374 (2009).  Under this cause of action, a plaintiff must show that (1) the employer discharged the employee, (2) in retaliation for the employee's activities, and (3) that the discharge violates a clear mandate of public policy.  *Fellhauer v. City of Geneva*, 142 Ill. 2d 495, 505, 568 N.E.2d 870, 875 (1991).  Illinois courts have never assigned a precise definition to what is meant by public policy.  "[I]n general, it can be said that public policy concerns what is right and just and what affects the citizens of the state collectively.  It is found in the State's constitution and statutes and, when they are silent, in its judicial decisions."  *Turner*, 233 Ill. 2d at 500, 911 N.E.2d at 374 (quoting *Palmateer v. International Harvester Co.*, 85 Ill. 2d 124, 130, 421 N.E.2d 876 (1981)).  The claim of retaliatory discharge is most commonly recognized in cases in which employees have been discharged for reporting violations of the law to their superiors, *Petrik v. Monarch Printing Corp.*, 111 Ill. App. 3d 502, 444 N.E.2d 588 (1st Dist. 1982), or for refusing to work under conditions that contravene government-mandated safety codes, *Wheeler v. Caterpillar Tractor Co.*, 108 Ill. 2d 502, 485 N.E.2d 372 (1985).

As a preliminary matter, Prafulla has no claim for retaliatory discharge because she herself undertook no activity that could form the basis of Defendants' retaliation.  The case law suggests that an employee may maintain an action for retaliatory discharge only when his *own* conduct forms

---

[22]    Obviously, the claim that Plaintiffs were terminated in retaliation for Vasant's complaint is potentially in tension with the claim that Plaintiffs were terminated as the result of impermissible discrimination.  *Cf. Visser v. Packer Engineering Associates, Inc.*, 924 F.2d at 657 ("[I]f Visser was fired because of his disloyalty to Packer the natural though not inevitable inference is that he was not fired because of his age."); *McGowan v. Deere & Co.*, 581 F.3d at 582 ("McGowan claims that Dr. Candler is biased against him because he was upset [about] a settlement . . . . If this is true, it certainly would reflect negatively on Dr. Candler's professionalism, but it would not be unlawful under Title VII or § 1981.") There is nothing that requires Plaintiffs to advance only consistent claims, however, and, it is possible that a jury would find either retaliation or discrimination motivated Defendants' employment decision.

the impetus for retaliation. Plaintiffs can cite no case in which an Illinois court has ever recognized a claim of retaliation based on the actions of a spouse, family member, or any other third party. Given the limited and narrow nature of this claim, this court declines to extend it in favor of Prafulla. Vasant's claim for common-law retaliation, however, is cognizable under Illinois law. Illinois courts recognize a retaliation claim for employees who are discharged for reporting violations of the One Day Rest in Seven Act, 820 ILCS 140/1 *et seq.*, to their superiors. *Carty v. Suter Co., Inc.*, 371 Ill. App. 3d 784, 863 N.E.2d 771 (2nd Dist. 2007) ("In holding [that One Day Rest in Seven Act supports claim for retaliation], we are not declaring public policy; the legislature has already done so."). Vasant complained to his superiors that Bissias assigned him to work consecutive work days in a manner that violated the Act. Under *Carty,* that is enough to raise public policy concerns that implicate a retaliatory discharge claim. (*Id.*)

Plaintiffs have also produced evidence sufficient to support the inference that Vasant was terminated in retaliation for his complaint against Bissias. As already stated, the lone imperfection in Vasant's otherwise exemplary employment record was a single and seemingly inconsequential act, transferring five cases of windshield fluid between nearby gas stations. There is a genuine dispute of fact as to whether the rules that prohibited that transfer were ever actively enforced against anyone other than Vasant and his wife. Vasant asserts that his superior, Defendant Kelly Bissias, authorized the transfer, and Defendants admit that Bissias had authorized and ordered similar transfers prior to August 2006. Bissias denies that she authorized anything, but Vasant's version of events is plausible and the court must credit it at this stage. Bissias was aware of the initial transfer the day it occurred, but she did not report it for several days and she did not speak to Vasant about it. All of the relevant decision makers who approved of Vasant's firing were aware that he had complained about Bissias.

The timing of the Thakkars' termination further supports an inference of retaliation. Vasant filed his second complaint against Bissias on January 17, 2007. Kemper received the complaint

28

and opened an investigation on January 25, 2007. The next day, Bissias reported Vasant and Prafulla to Marcinkiewicz for violating the driving rules five days earlier. Bissias called Marcinkiewicz again the following day, January 27, to report Vasant a second time. Marcinkiewicz opened his own investigation into the Thakkars' conduct, and on February 12, Marcinkiewicz, Kemper, Bissias and Vasant met to discuss both Vasant's complaint letter and his alleged violation of the driving rules. Marcinkiewicz fired Vasant and Prafulla on February 16, 2007. Four days later, SOI closed its investigation into Vasant's complaint without action. The timing of Vasant's dismissal, coming immediately on the heels of his second complaint against Bissias, bolsters his retaliatory discharge claim. *See Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009) (suspicious timing supports an inference of retaliation where an adverse impact comes immediately on the heels of a protected activity).

Marcinkiewicz's motives are at issue, as well. Vasant's first complaint against Bissias was largely borne out, but it nevertheless resulted in Marcinkiewicz's reprimanding Vasant. It is fair to infer that Vasant's second, more serious complaint, in which Vasant went over Marcinkiewicz's head to Kemper, might have elicited bad feelings on Marcinkiewciz's part. Both Marcinkiewicz and Bissias denied having had any knowledge of Vasant's second complaint prior to his discharge, but Kim Kemper's testimony is inconsistent with that contention. Kemper testified that she discussed Vasant's second complaint with both Bissias and Marcinkiewicz at or around the very same time that Marcinkiewicz was investigating the driving infraction. These facts, and the inconsistent testimony of Marcinkiewicz and Bissias, permit the inference that some impermissible motive lies at the core of Vasant's firing. Vasant is entitled to present his theories to a jury. Summary judgment on his retaliatory discharge claim is denied.

### B. Tortious Interference

Advancing nearly identical arguments as those presented in her motion to dismiss, Defendant Bissias also seeks summary judgment on Vasant's tortious interference claim. As the

court explained in its previous ruling on that motion, Illinois law distinguishes between an employee's supervisor and a typical officious-intermeddling defendant when assessing liability for tortious interference. (Minute Order, D.E. 33.) An action for tortious interference cannot be maintained against a plaintiff's supervisor for actions undertaken in the supervisor's professional capacity and in furtherance of her duties unless the supervisor acted for the purpose of furthering her own interests or out of a desire to harm the plaintiff. *See Taylor-Doyle v. Poehls*, No. 07-1048, 2007 WL 2680494, *5 (C.D. Ill. Sept. 7, 2007).[23] Drawing on this distinction, Bissias contends that Vasant cannot demonstrate that she had the requisite intent to incur liability under the standard.

The court disagrees. There is evidence that Bissias harbored resentment against Vasant as a result of his two separate complaints against her. According to Vasant, Bissias assigned him to undesirable tasks and unfavorable work schedules immediately after she became aware of Vasant's initial complaint. Following his second complaint, Vasant was discharged on the strength of Bissias's accusation that he had transferred inventory without authorization. According to Vasant's account, Bissias initially approved of the transfer but subsequently reported him anyway. A jury could conclude that Bissias intended to cause Vasant's termination. Summary judgment on the tortious interference claim against Bissias is, therefore, denied.

## CONCLUSION

Plaintiffs' motion to supplement the record [71] is granted in part and denied in part.

---

[23] Because the purpose of the distinction is to protect supervisors from incurring liability based on their innocent employment decisions, the court considers whether the supervisor was the ultimate decision-maker responsible for terminating the plaintiff. *See Hoskins v. Droke*, No. 94-5004, 1995 WL 318817, *5-6 (N.D. Ill. May 24, 1995). Bissias was not the ultimate decision-maker responsible for firing Vasant, but her report was the precipitating cause of the investigation into Vasant's conduct, and Bissias's assertion that she did not authorize the conduct supported the conclusion that Vasant should be fired. Viewing the facts in the light most favorable to Vasant, it is fair to say that Bissias played a substantial role in causing and, perhaps, even engineering Vasant's termination. Although the parties have not directly addressed it, the court notes that in certain circumstances, this Circuit has recognized a "cat's paw theory" that imputes a subordinate's impermissible motives to a decision-making superior if the subordinate wields a "singular influence" over the superior. *See Staub v. Proctor Hosp.*, 560 F.3d 647, 655-56 (7th Cir. 2009).

Paragraphs one, two, three, five, and seven of Nick Patel's affidavit are admitted, but paragraphs four and six are stricken. Defendants' motion for summary judgment [51] is granted in part and denied in part. Plaintiffs' Section 1981 claims based on Defendants' failure to promote Plaintiffs and Defendants scheduling Vasant to work ten consecutive days (Count II) are dismissed with prejudice. Plaintiffs' age discrimination claims (Count III) and Prafulla Thakkar's retaliatory discharge claim (Count VII) is also dismissed with prejudice. Plaintiffs' race, national origin, and religious discrimination claims for unlawful termination under Title VII and Section 1981 (Counts I and II) survive. If Plaintiffs prevail at trial, however, they will not be permitted to recover punitive damages under both Section 1981 and Title VII. Vasant Thakkar's state law claims (Counts VI and VII) also survive summary judgment.

ENTER:

Dated: March 8, 2010

_____

REBECCA R. PALLMEYER
United States District Judge